466 S.W.2d 41 (1971)
L------ G------, Individually and as Next Friend of Z------ G------, Appellant,
v.
F------O. P------, Appellee.
No. 14917.
Court of Civil Appeals of Texas, San Antonio.
March 10, 1971.
Rehearing Denied April 7, 1971.
Harry B. Adams, III, Royal K. Griffin, John L. Sanders, San Antonio, Tex., for appellant.
KLINGEMAN, Justice.
This is an appeal from a judgment declaring appellee to be the father of Z______ G______, a minor child born out of wedlock, but decreeing that there is no civil liability on the part of appellee to support such child.
The only testimony in the record was by the mother of such child, who testified that she was unmarried when she met appellee at a party and had subsequently dated him; that as a result of this dating, a child had been born; that there is no doubt in her mind that appellee is the father of the child; that appellee is a married man, but that at the time of such dating, she did not know this. Appellee had legal representation in the early proceedings, and an answer was filed on his behalf, consisting of a general denial, and a plea in abatement asserting that no cause of action exists either by statutory or common law in Texas for the support of a minor child born out of wedlock.[1] Appellee's attorney was given leave to withdraw as counsel prior to the trial of said cause, and appellee did not appear in said trial, either personally or by attorney.
Appellant asserts that such judgment denying such child the support of her father constitutes a denial of equal protection of law under the Fourteenth Amendment of the United States Constitution, and Article 1, Section 3 of the Texas Constitution, Vernon's Ann.St., and is an unconstitutional discrimination contrary to law.
At common law, the father is under no legal obligation for the support and maintenance of his illegitimate children. Lane v. Philips, 69 Tex. 240, 6 S.W. 610 (1887); Beaver v. State, 96 Tex.Cr.R. 179, 256 S.W. 929 (1923); 10 Am.Jur.2d Bastards § 68; 10 C.J.S. Bastards § 18, page 86. The majority of the courts in this country have *42 held that without legislation on the subject, the father of an illegitimate child cannot be required to provide for its support. 30 A.L.R. Anno.IllegitimateDuty to Support 1069; 10 Am.Jur.2d § 68, supra; 10 C.J.S. § 18, supra.
At the present time there is no Texas statute imposing on the father the duty to support and maintain an illegitimate child. We do not consider it the purpose of this opinion to debate the various sociological reasons for or against such legislation. Sufficient to say, the Family Law Section of the State Bar of Texas has recommended such legislation to both the 61st and 62nd Legislatures of the State of Texas. At the present time all but two states have such legislation. It must be recognized, however, that a dominant feature of any type of legitimation statutes is the provision for proper standards and safeguards for determining the paternity of an illegitimate child.
The Texas Courts have uniformly held that a father is not under a common law or statutory duty to support his illegitimate child. See Lane v. Philips, supra; Beaver v. State, supra; 8 Tex.Jur.2d Bastardy § 13. The Supreme Court in Home of Holy Infancy v. Kaska, 397 S.W.2d 208 (Tex. 1965), has recently reconsidered at length the rights and standing of the father of an illegitimate child. It was there said: "There are no similar statutes [legitimation] in Texas, and here a father is not under a common law or statutory duty to support his illegitimate child." In the face of this positive holding by our Supreme Court, the cases from other jurisdiction have little, if any, application. However, such holdings must be considered in the light of whether or not such jurisdiction has enacted some type of legitimation statute.
The trial court properly held that there was no cause of action in this State to impose civil liability on the part of appellee to support such illegitimate child. The judgment of the trial court is affirmed.
CADENA, Justice (dissenting).
Appellant's sole complaint is that the Texas rule which consistently with the general governmental policy of condemning children born out of wedlock to a second class way of life, deprives an illegitimate child of the right to paternal support which is accorded to legitimate children, violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. The majority opinion notes appellant's contention and then proceeds to ignore it by applying, without effort to defend, the very rule of laws which appellant assails as unconstitutional.
Perhaps there was a time when the contention here made by appellant could be relegated to that class of arguments which courts consider too frivolous to merit discussion. But, at least during the past decade, there has been an increased concern with the validity, under the Equal Protection Clause, of governmental policies which discriminate against bastards.[1] Consideration. *43 of the problem increased after the May 20, 1968, decisions by the Supreme Court of the United States in Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436, and Glona v. American Guarantee and Liability Insurance Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441, invalidating classifications based on illegitimacy found in a wrongful death statute.[2] Neither Levy nor Glona is mentioned by the majority.
Levy struck down the provisions of the Louisiana wrongful death statute which denied to a child born out of wedlock recovery for the wrongful death of his mother. In Glona, the Court invalidated a provision of the same statute which deprived a woman of the right to recover for the wrongful death of her illegitimate child.
Admittedly, the actual holdings in Levy and Glona do no more than equalize the position of legitimate and illegitimate children vis-a-vis their mother insofar as wrongful death claims against tortfeasors are concerned. The extension of the Levy and Glona decisions to eliminate all distinctions between legitimate and illegitimate children in their relation with their mother is difficult to avoid and would work no significant alteration of the Texas Law.[3]
However, the extension of Levy[4] to the relationship between an illegitimate child and his father would bring about profound changes in the status of the out-of-wedlock child, since most of the legal disadvantages under which such a child labors result from his legal relations, or, more precisely, the lack of such relations, with his father. But we are not here concerned with the validity of all rules regulating the relationship between a father and his illegitimate child. We need consider only the right to paternal support, which is, perhaps, the most important of the rights which the Texas law grants to a legitimate child and denies to a bastard. A denial of the right to paternal support has a greatly more serious effect on a child than does, for example, a denial of the right to bear his father's name.
Interestingly enough, the Supreme Court of Louisiana, on remand of Levy from the United States Supreme Court, assumed that the decision was not limited to the *44 mother-child relationship.[5] With reference to the precise question before us, the highest courts of Ohio and Missouri have reached contradictory results.
The Ohio Supreme Court, by a 4-3 decision, concluded that Levy applied solely to "the intimate, familial relationship which exists between a mother and her child, whether the child is legitimate or illegitimate." Baston v. Sears, 15 Ohio St.2d 166, 239 N.E.2d 62, 63, n.* (1968). The Baston majority felt that a rule denying the right to paternal support to illegitimates was merely a recognition of the nature of the obligation undertaken by the father at marriage. The marriage contract was viewed as including the promise by the husband to support the legitimate issue of the union. An illegitimate child, therefore, cannot claim a right of support against his father who has not consented to be bound. 239 N.E.2d at 63-64.
The decision of the Missouri Supreme Court on the same question differs from that of the Ohio Court not only in the result reached, but also in the lack of dissent. The unanimous conclusion was simply stated: "The principles applied by the United States Supreme Court would render invalid state action which produces discrimination between legitimate and illegitimate children insofar as the right of the child to compel support by his father is concerned." R______ v. R______, 431 S.W.2d 152, 154 (1968).
Apparently, the only other case in which the highest court of a state has considered the problem of paternal support since the Levy decision is Munn v. Munn, 450 P.2d 68 (1969, Colo.). There, the statute providing for the support of an illegitimate child by his father contemplated a judgment awarding damages against the father. The judgment in such a case was a final judgment, no subject to subsequent modification upon a showing of changed financial conditions. Since, under Colorado law, the father of a legitimate child has the right to reopen the case for the purpose of having the amount lowered to reflect changed financial conditions. It was held that the denial of a similar right of the father of an illegitimate child was a denial to such father of the equal protection of the laws. By way of dictum, the Colorado Supreme Court added that the statute was equally objectionable from the viewpoint of the illegitimate child "for the jury verdict freezes his right to support from his father at a fixed level without regard to changing financial needs on his part." 450 P.2d at 69.
It may be conceded, as the majority opinion here asserts, that it is not the purpose of that opinion "to debate the various sociological reasons for or against" the adoption of bastardy statutes. But, in view of the contention pressed upon us by appellant, we cannot escape the task of analyzing the governmental purpose which is supposedly promoted by the rule which discriminates against illegitimates in the matter of the right to paternal support. When a state law is challenged under the Equal Protection Clause, the critical question concerns the existence of a rational nexus between the classification adopted and a valid governmental objective.[6] The issue *45 is not whether the State of Texas may create a class composed of children born out of wedlock and subject the members of that class to less favorable treatment than that accorded to legitimate children, but whether there is a rational connection between such disparate treatment and the promotion of a legitimate governmental interest.[7] If the majority's unwillingness to "debate" implies that equal protection problems can be solved without discussion of the purpose, sociological or otherwise, which prompted placing of the members of a class in a legally disadvantageous position, then this Court today announces a novel approach to problems involving the Equal Protection Clause. To refuse to discuss the purpose of a discriminatory rule is to refuse to consider the claim of constitutional right.
The traditional arguments advanced in justification of laws discriminating against illegitimate children can be simply stated. It is said that the discrimination promotes morals and the general welfare because it (1) encourages marriage and deters extramarital sexual relations; (2) prevents disruption of the family unit; and (3) allows a father to choose whether or not he will recognize the child.[8] It cannot be denied that the promotion of these ends is a legitimate governmental objective. But the problem here is whether the State of Texas has chosen a constitutional method of pursuing an undoubted state interest.
Even if we assume, closing our eyes to the soaring illegitimate birth rate, that a woman will refrain from illicit sexual activity in order to avoid bearing a child who will be denied paternal support, there is no basis for the conclusion that the Equal Protection Clause permits resort to this practice of vicarious expiation.[9] Nor can it be seriously contended that the governmental purpose of promoting marriage and discouraging sexual promiscuity is promoted by a rule which guarantees to the rake immunity from liability for the support of the children born as a result of his extramarital copulative performances.
The argument that compelling a man to support his illegitimate offspring would tend to destroy the family is singularly unpersuasive. There is nothing to indicate that the 48 states which have imposed such an obligation on an illegitimate father have experienced a disruption of the family institution to an extent greater than the two states, including Texas, which deny the right to paternal support to illegitimates. The specious nature of the family protection argument is laid bare by the fact that freedom from the support obligation is not limited to married men. The same immunity is extended to illegitimate fathers who have no family to protect.
If preservation of the family unit is, indeed, the purpose of discrimination against illegitimates in the matter of support, it is strange that the state shows no concern whatever for the stability of the legitimate family of the illegitimate mother, on whom the State of Texas places the obligation of support.[10]
*46 It will be recalled that the Ohio court justified the difference in the support obligation owed by a man to his legitimate and illegitimate children on the theory that the legitimate father assumes, as an incident of the nuptial contract, the obligation to support the children of the marriage. Under this "consent" theory, the right of a legitimate child to paternal support is apparently a contractual right which he asserts as a third party beneficiary of the marriage contract.
The notion that a father is bound to support his legitimate children solely because he consents to do so assumes that children owe their right to support to the existence of marriage. In fact, marriage owes its existence to the necessity that children be supported.[11] The fictitious nature of the consensual nature of the father's support obligation is apparent. The obligation to support legitimate children would exist even if the man, during the marriage ceremony, expressly stated, with the full acquiescence of the bride, that he did not assume such obligation. If such a repudiation is ineffective, then consent is irrelevant. "Implied consent," then, is a misnomer. The obligation is imposed by law, irrespective of consent.
It is recognized that when a classification created by law is called into question, "if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed." Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 79, 31 S.Ct. 337, 340, 55 L.Ed. 369, (1911). Even under this approach, which requires the exercise of maximum judicial self-restraint, the classification here under attack can be upheld only by freeing the judicial imagination to wander vagrant and unconfined, and indulging the naive assumption that by relieving a man of his obligation to support his illegitimate children, the law encourages him to withhold his sexual favors from women who are not willing to marry him. This assumption has no basis in human experience. If this fantasy is discarded, we must conclude that the discrimination against bastards with respect to the right to paternal support has its basis in prejudice rather than reason.[12]
The classification here is characterized by a general illsuitedness to the advancement of any proper governmental interest. It is highly adaptable to uses which are oppressive in the sense of systematic and unfair devaluation of the claims of certain persons to substantial equality of treatment. It possesses a potency to injure and stigmatize the disadvantaged class by implying popular or official belief in their inherent inferiority or underservedness. It penalizes a class of persons solely because of conditions which are wholly beyond their control and which result from the conduct of third parties occurring before the penalized persons came into existence. These are the hallmarks of "invidious" discrimination.
The opinion by the Texas Supreme Court in Home of Holy Infancy v. Kaska, 397 S.W.2d 208 (1965), does not support the refusal by this Court to consider appellant's equal protection contention. Kaska contains no discussion of the constitutional problem, and the opinion in that case precludes the inference that the highest tribunal of this state had its attention called to the equal protection question.
The fact that Texas has not adopted a bastardy statute is not pertinent. In fact, it is the policy of the state in depriving illegitimates of the right to paternal support *47 which explains appellant's presence here. Nor is it true that it "must be recognized * * * that a dominant feature of any type of legitimation statutes is the provision for proper standards and safeguards for determining the paternity of an illegitimate child." The Texas legitimation statute contains no such provisions. "Where a man, having by a woman a child or children shall afterwards intermarry with such woman, such child or children shall thereby be legitimated and made capable of inheriting his estate." Tex.Ann.Prob.Code Sec. 42. No procedure is established for the purpose of determining whether a man who marries a woman who has conceived and given birth to a child out of wedlock is, in fact, the father of the child. In any event, a constitutional right is not dependent for its existence on state action establishing a specific procedure for the ascertainment of the facts on which the constitutional claim is based. The vagaries of local practice cannot be allowed to prevail over a constitutional right. Gouled v. United States, 255 U.S. 298, 313, 41 S.Ct. 261, 65 L.Ed. 647 (1921). If an illegitimate child has a constitutional right to paternal support, then, under Article 1, Sec. 13 of the Texas Constitution, the legislature is powerless, either by affirmative action or by failure to act, to destroy his cause of action by depriving him of a forum. Middleton v. Texas Power & Light Co., 108 Tex. 96, 185 S.W. 556 (1916).
The difficulty of ascertaining paternity, in the absence of the strong presumption of legitimacy in the case of a child born in wedlock, presents no obstacle to recognition of the claim of an illegitimate child. The fact that recognition of a right may lead to the assertion of groundless charges is not a sufficient reason for refusing to recognize the existence of the right. Relief, of course, will be granted only in those cases where paternity is established.[13] Here, the trial court found as a fact that appellee is the father of the child in question. Appellee has not challenged the sufficiency of the evidence to support this finding.
NOTES
[1] Establishment of paternity is a prerequisite to allowing the court to establish a relationship between the child and the father upon which the illegitimate child could base his claim to support. The Texas Constitution and the Texas Statutes nowhere provide for a "bastardy proceeding" to establish the paternity of the father. An act patterned after the Uniform act on Legitimacy was submitted to the 61st Legislature in 1969; however, such proposed act did not become law. Such act would have established procedures for determination of paternity and provided for support of an illegitimate child. See Senate Bill No. 281; University of Texas: Krause, Proposed Uniform Act on Legitimacy, 44 Tex.L.Rev. 829 (1966); Mullin, Constitutional Law, 1 St. Mary's Law Journal 146, 149-150 (1969).
[1] Note, "`Suitable Home' Tests Under Social Security: A Functional Approach to Equal Protection," 70 Yale L.J. 1192 (1961) is one of the earliest attempts to analyze classifications based on legitimacy in the light of the Equal Protection Clause. The problem is discussed in Foote, Levy & Saunders, Cases on Family Law 72 (1966). Apparently, the first court to take note of the equal protection argument was the Supreme Court of Washington. After interpreting the Washington wrongful death statute as granting to both legitimate and illegitimate children to recover for the wrongful death of a parent, the court said: "Significantly, a very persuasive argument can be made that a decision contrary to ours would deny appellant's daughter her Fourteenth Amendment right to equal protection of the laws, since there is no valid social reason, for purposes of welfare legislation, for distinguishing between members of the class `illegitimate children' and other members of the broader class `children' to which members of the more narrow class belong." Armijo v. Wesselius, 73 Wash.2d 716, 440 P.2d 471, 474 (1968). The "very persuasive argument" referred to by the Washington Court is found in the article by Professor Krause, Equal Protection for the Illegitimate, 65 Mich.L.Rev. 477 (1967).
[2] Krause, Legitimate and Illegitimate Off-spring of Levy v. LouisianaFirst Decisions on Equal Protection and Paternity, 36 U. of Chi.L.Rev. 338 (1969); Gray & Rudovsky, The Court Acknowledges the Illegitimate: Levy v. Louisiana and Glona v. American Guarantee and Liability Ins. Co., 118 U. of Pa.L.Rev. 1 (1969); Comment, The Expanding Rights of the Illegitimate, 3 Creighton L.Rev. 135 (1970); Note, 21 Case W.Res.L.Rev. 292 (1970); Note, 54 Minn.L.Rev. 1336 (1970); Note, 44 Tul.L.Rev. 640 (1970).
[3] In Texas, such an interpretation of Levy and Glona apparently would work no substantial change in any of the important relations of an illegitimate child to his mother. In this state, the mother is entitled to custody of such a child and has the duty to support it. Even before the Levy decision, the Texas courts had held that a child born out of wedlock is entitled to recover for the wrongful death of his mother. American General Ins. Co. v. Alexander, 216 S.W.2d 997 (Tex.Civ.App.Beaumont 1948, writ ref'd). For the purposes of inheritance, an illegitimate child "shall be treated the same as if he were the legitimate child of his mother * * *" Tex.Prob. Sec. 42, V.A.T.S. Despite early statements to the effect that the term "children," as used in our workmen's compensation statutes, embraced only legitimate children, it is now held that an illegitimate child may recover compensation benefits for the death of his mother. 62 Tex.Jur.2d, Workmen's Compensation, Sec. 58, p. 602.
[4] Only the Levy decision involved the rights of an illegitimate. Glona involved the rights of the mother of a child born out of wedlock. It is, therefore, believed that Levy is the more pertinent of the two decisions.
[5] Levy v. State of Louisiana, 253 La. 73, 216 So.2d 818, 820 (1968).
[6] "But the classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920). See generally, Tussman & tenBroek, The Equal Protection of the Laws, 37 Calif.L.Rev. 341, 345-346 (1949).

The suggestion that a law is immune to constitutional attack if it applies equally to all persons within the statutory class has been rejected. "Judicial inquiry under the Equal Protection Clause, therefore, does not end with a showing of equal application among the members of the class defined * * *." McLaughlin v. State of Florida, 379 U.S. 184, 191, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964). Consequently, the fact that the Texas law deprives all illegitimate children of the right to paternal support is irrelevant to the consideration of the equal protection problem.
[7] Tussman & tenBroek, op. cit., supra, n. 6, at 346.
[8] See Krause, Equal Protection for the Illegitimate, 65 Mich.L.Rev. 477, 491-98 (1967). The Louisiana court in Levy emphasized the interest of the state in discouraging out-of-wedlock births and encouraging marriage. Levy v. State, 192 So.2d 193, 195 (La.Ct.App.1966).
[9] Krause, Equal Protection and Paternity, 36 U. of Chi.L.Rev. 338, 347, n. 34 (1969).
[10] May the illegitimate mother complain that she is denied the equal protection of the laws because her obligation to her illegitimate child are substantially greater than those imposed on the man who was her partner in the socially disapproved procreative act?
[11] 1 Westermark, History of Human Marriage, 72 (1921).
[12] "The bastard, like the prostitute, thief and beggar, belongs to that motley crowd of disreputable social types which society has generally resented, always endured. He is a living symbol of social irregularity, and undesirable evidence of contramoral forces; in short a problem as old and involved as human existence itself." Davis, Illegitimacy and the Social Structure, 45 Am.J. of Sociology, 215 (1939).
[13] The approach that recovery will be denied in the absence of proof but will be granted in the presence of proof has been denounced as being "altogether too simplistic." Jerry Vogel Music Co. v. Edward B. Marks Music Corp., 425 F.2d 834, 836, n. 4 (2d Cir., 1969). Cf: "It is * * * to be observed that the argument against allowing such an action because groundless charges may be made is not a good reason for denying recovery. If the right to recover for injury resulting from the wrongful conduct could be defeated whenever such dangers exist, many of the grievances the law deals with would be eliminated. That some claims may be spurious should not compel those who administer justice to shut their eyes to serious wrongs * * *. It is the function of courts and juries to determine whether claims are valid or false. This responsibility should not be shunned merely because the task may be difficult to perform." Samms v. Eccles, 11 Utah 2d 289, 358 P.2d 344, 347 (1961).